**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

WIA HOLDINGS LLC, WIA CORPORATE )
BUYER INC., WORLD INSURANCE )
ASSOCIATES, LLC and SCOTTISH )
AMERICAN INSURANCE GENERAL )
AGENCY, INC., )
                          Plaintiffs, )
                                   )     **C.A. No.: 2024-1226-PRW**
    v. )
                                     )
SCOTTISH AMERICAN CAPITAL )
LLC, PAUL THOMSON, and )
JOHN DOES 1–10, )
                         Defendants. )

Submitted: October 23, 2025
Decided: January 20, 2026

*Upon Defendants Scottish American Capital LLC, Paul Thomson,*
*and John Does 1–10's Partial Motion to Dismiss,*
**GRANTED in part and DENIED in part.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Mackenzie M. Wrobel, Esquire, and Brandon R. Harper, Esquire, DUANE MORRIS LLP, Wilmington, Delaware; Michael J. Canning, Esquire (*argued*), GIORDANO, HALLERAN & CIESLA, P.C., Red Bank, New Jersey, *Attorneys for Plaintiffs WIA Holdings LLC, WIA Corporate Buyer Inc., World Insurance Associates LLC and Scottish American Insurance General Agency LLC*.

William M. Lafferty, Esquire, Thomas P. Will, Esquire (*argued*), and Phillip Peytan, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendants Scottish American Capital, LLC, Paul Thomson, and John Does 1–10*.

**WALLACE, J.**

This action arises from a post-closing dispute between the purchasers of an insurance business—WIA Holdings LLC and WIA Corporate Buyer Inc. (together, "WIA")—and the seller, Scottish American Capital LLC ("SAC"), along with its managing member, Paul Thomson ("Thomson").[1] WIA acquired the business through its affiliates, including World Insurance Associates LLC and Scottish American Insurance General Agency, Inc. ("SAIGA"), the latter of which was formerly owned and operated by SAC.[2] Plaintiffs allege that, in connection with the transaction, SAC, Thomson, and other unidentified SAC insiders (John Does 1–10, together with SAC and Thomson, "Defendants") breached contractual representations and indemnification obligations, concealed material liabilities and proceedings, and engaged in post-closing conduct that left SAC unable to satisfy its obligations under the governing acquisition agreement.[3]

Defendants have moved to dismiss significant portions of the operative pleading, contending that Plaintiffs' claims sound solely in contract, are time-barred, impermissibly duplicative, inadequately pleaded, or foreclosed by settled principles of Delaware law governing fraud, unjust enrichment, and claims against corporate agents and fictitious defendants.[4] Plaintiffs counter that the Complaint adequately

---

[1] Second Amend. Compl., at ¶¶ 1–8, 14 (D.I. 18).

[2] *Id.*, at ¶¶ 1–8, 40.

[3] *See generally* Second Amend. Compl.

[4] *See generally* Defs.' Op. Br. (D.I. 21); *see also* Defs.' Reply (D.I. 27).

pleads contractual breaches, fraudulent conduct, and asset transfers that rendered SAC judgment-proof, and that dismissal at the pleading stage would improperly require the Court to resolve disputed factual issues.[5] For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Partial Motion to Dismiss.

## I. FACTUAL[6] AND PROCEDURAL BACKGROUND

On April 9, 2021, WIA entered into a Securities Purchase Agreement (the "SPA" or "Contract") with SAC[7] pursuant to which WIA acquired a portfolio of SAC's insurance-related assets and operating subsidiaries, including SAIGA, a wholesale insurance agency.[8] The SPA set out a framework of representations, warranties, and indemnification obligations, which—and most importantly for this matter—included that SAC and its subsidiaries were not subject to undisclosed proceedings or court orders, were in compliance with applicable laws, and had provided responsive diligence materials.[9] The agreement also provided warranties for certain post-closing insurance coverage and indemnity provisions for specified

---

[5] *See generally* Pls.' Answer (D.I. 23).

[6] Unless otherwise noted, the following facts are drawn from Plaintiffs' Second Amended Complaint. *See Windsor I, LLC v. CW Capital Asset Mgmt.* LLC, 238 A.3d 863, 873 (Del. 2020) ("In most cases, when . . . [the] Court considers a 12(b)(6) motion, it limits analysis to the 'universe of facts' within the complaint and any attached documents.").

[7] Second Amend. Compl., at ¶ 14.

[8] *See generally* Second Am Compl. Ex. B.

[9] Second Amend. Compl., at ¶¶ 17, 19–21, 24.

losses.[10]

### A. THIS SUIT

WIA came to regret aspects of the transaction and filed a Verified Complaint in the Court of Chancery.[11] Very shortly thereafter, it filed a parallel Complaint in the Superior Court. The actions were consolidated at WIA's request.[12] Following consolidation, WIA amended its charging document multiple times. The operative pleading is now the Verified Second Amended Complaint, which was filed on April 30, 2025, and is targeted by the pending motion to dismiss.[13]

Defendants moved to dismiss portions of the Complaint.[14] During the pendency of the motion-to-dismiss proceedings, the parties jointly agreed that certain claims and issues pleaded in the Complaint be stayed to permit the motion to proceed in a focused manner.[15] Accordingly, the factual background set forth below is provided solely to give context to the allegations implicated by the pending motion and does not purport to address the entirety of the claims asserted in the Complaint.

---

[10] Second Amend. Compl., at ¶¶ 25, 109–113.

[11] D.I. 1.

[12] D.I. 10; D.I. 7 (Plaintiffs' Letter seeking cross-designation).

[13] D.I. 18 [hereinafter, "the Complaint"].

[14] D.I. 21.

[15] D.I. 32 (Parties' Post-hearing Joint Letter); *see also* Transcript of Oral Argument on Defs.' Am. Partial Mot. to Dismiss & Partial Mot. to Stay at 4–6. Defendants do not seek to dismiss the portions of the action relating to the Evanston Insurance action, including Plaintiffs' indemnification claims arising from that matter. *See generally* Defs.' Op. Br.

## B. RELEVANT FACTUAL ALLEGATIONS

The factual background alleged in the Complaint is extensive. For purposes of the factual narrative relevant here, it's helpful to identify four categories of allegations that provide context for the claims implicated by the motion to dismiss. These include: (1) allegations of pre-closing misconduct at SAIGA that give rise to the AIG Claim; (2) allegations relating to SAC's disclosures and conduct in connection with the SLB litigation and related settlement restrictions; (3) allegations concerning additional proceedings and liabilities that WIA contends weren't disclosed at the time of the SPA; and (4) allegations regarding SAC's post-closing obligations under the SPA, including insurance coverage and the handling of escrowed funds. The sections that follow summarize these allegations as background.

### 1. The AIG Claim

Approximately eighteen months after the closing, in October 2022, American International Group, Inc. ("AIG")—a significant underwriter in the insurance industry—notified SAIGA that it had uncovered serious misconduct during the period from 2016 to 2019 when it was operated by SAC.[16] AIG alleged that SAIGA engaged in multiple misrepresentations to secure coverage for insureds who didn't meet underwriting guidelines, obtained policies for fictitious entities, and made

---

[16] Second Amend. Compl., at ¶¶ 40–54.

unauthorized changes to policies.[17] According to WIA, SAC knew of the issue but neither remedied them nor disclosed them to WIA.[18] As a result, AIG revoked SAIGA's portal access and demanded a full investigation; WIA contends that it was forced to investigate and defend against the matter—a matter that should have been disclosed in the Contract with SAC.[19]

### 2. The SLB Actions

Before the SPA was signed, SAIGA and SAC were already tangled in litigation with Standard Lines Brokerage ("SLB").[20] The dispute was disclosed to WIA and ended in a settlement: SAIGA agreed not to compete with SLB, and SAC placed $250,000 into escrow to cover any potential liability from the matter.[21]

But when the SPA closed and control of SAIGA passed to WIA, WIA alleges that it learned that the SLB issue wasn't resolved.[22] WIA claims that SAC quietly instructed SAIGA employees to disregard the non-compete obligations, which artificially inflated SAIGA's revenues and, in turn, drove up the sale price under the SPA.[23] The handling of these issues, WIA alleges, was compounded by conflicts of

---

[17] *Id.*, at ¶ 42.

[18] *Id.*, at ¶¶ 42–45, 51.

[19] *Id.*, at ¶¶ 40–50, 46–48.

[20] *Id.*, at ¶¶ 61–62.

[21] *Id.*, at ¶¶ 62–64.

[22] *Id.*, at ¶¶ 64–65.

[23] *Id.*, at ¶¶ 64–67, 72–73.

interest and financial maneuvers.[24]

In March 2024, SLB filed a motion to enforce the settlement restrictions and launched suit in Florida.[25] SLB accused the-now-WIA-owned-SAIGA of repeated violations that had caused millions of dollars in damages.[26] According to WIA, the risk of such a claim was no surprise to SAC; WIA alleges that, at the time of the SPA, SAC knew the potential liability in the SLB matter was far greater than the $250,000 held in escrow—but concealed that fact and their continued breach of the settlement during negotiations.[27]

### 3. "Additional Undisclosed Proceedings"

WIA points to a "spreadsheet" of other claims, attached as Exhibit C to its Complaint, that it says weren't disclosed.[28] Included with the exhibit is a document—titled "Cash Owed to Novate (from SAC & 627)"—that lists several line items under the heading "Legal (HR Matters)" that are identified by employee initials and total $276,201.17.[29] WIA generally calls out those matters in the

---

[24] *Id.*, at ¶¶ 64–67, 72–73.

[25] *Id.*, at ¶ 74.

[26] *Id.*, at ¶¶ 68–71.

[27] *Id.*, at ¶¶ 50, 75.

[28] *Id.*, at ¶ 168; Pls.' Answer, 16 ("The Plaintiffs are entitled to, and have made demand for, indemnification for reimbursement of the sum of $258,899.48 [for the company and $17,301.69 for Mr. Thomson] for payments made in the Undisclosed Proceedings, as detailed in the spreadsheet attached to the Indemnification Notice and Demand. Second Amend. Compl., ¶, Ex. C."); Second Amend. Compl., Ex. C.

[29] In its reply to the motion to dismiss, WIA clarifies that these "Undisclosed Proceedings" stem from the alleged misclassification of employees of a Company subsidiary as exempt from overtime

Complaint and seeks indemnification for them, invoking various SPA provisions.[30]

### 4. Internal Issues Related to the SPA

WIA describes two additional internal issues looming in the background of this suit. First, SAC was obligated either to provide tail insurance for WIA or to reimburse WIA for its purchase of such coverage.[31] Second, WIA claims that SAC, together with ten "John Does" and its "Chief Gopher," Mr. Thomson, distributed escrowed funds despite knowing that such distributions would leave SAC without sufficient assets to satisfy its liabilities to WIA.[32]

## II. PARTIES' CONTENTIONS

### A. PLAINTIFFS' CLAIMS

Plaintiffs assert the following contentions by count: (Counts I and II) Plaintiffs say that SAC breached the SPA and wrongfully refused to honor its contractual indemnification obligations; (Count III) Plaintiffs seek a declaratory judgment that SAC is obligated under the SPA to indemnify them for covered losses; (Count IV) Plaintiffs allege fraud, insisting that Defendants knowingly misrepresented or concealed material facts in the SPA with the intent that Plaintiffs rely on those representations; (Count V) Plaintiffs contend that SAC breached its duty to defend

---

requirements. Pls.' Answer, 16, 37–38.

[30] Second Amend. Compl., at ¶ 168; Pls.' Answer, 16.

[31] Second Amend. Compl., at ¶¶ 110–13.

[32] *Id.*, at ¶ 184.

and indemnify Plaintiffs in connection with the SLB Action and related enforcement and successor proceedings; (Count VI) Plaintiffs complain of unjust enrichment, alleging that Defendants improperly received and distributed transaction and escrow proceeds; (Count VII) Plaintiffs allege fraudulent transfer under Delaware law, contending that Defendants distributed substantially all of the Company's assets to insiders while insolvent or with actual intent to hinder, delay, or defraud Plaintiffs as creditors; and (Counts VIII–IX) Plaintiffs charge that Paul Thomson and the John Doe Defendants aided and abetted the alleged fraud and participated in a civil conspiracy to effectuate the asserted misrepresentations, nondisclosures, and asset transfers.[33]

## B. DEFENDANTS' MOTION TO DISMISS

Defendants characterize this case as a post-closing indemnification dispute governed entirely by the SPA, which they argue was deliberately structured to sharply limit the sellers' post-closing exposure and to channel most claims to representations-and-warranties insurance.[34] They emphasize that the SPA disclaims reliance on extra-contractual statements and defines fraud narrowly as an actual and intentional misrepresentation in the SPA itself. [35]

---

[33] *See generally* Second Amend. Compl.

[34] *See generally* Defs.' Op. Br.

[35] *Id.*, 21–40.

Defendants say that Plaintiffs' indemnification and breach-of-contract claims (Counts I, II, and III) fail because Plaintiffs don't adequately plead underlying breaches of the SPA and because the claim for breach of the tail-insurance covenant is time-barred under Delaware's three-year statute of limitations.[36] They further contend that the fraud claim (Count IV) fails under Rule 9(b) and is a mere attempted packaging of contract claims as fraud.[37] Defendants argue that Count V should be dismissed as duplicative of the indemnification and declaratory relief claims and provides no independent basis for relief.[38] They insist that the unjust enrichment claim (Count VI) is barred because the SPA comprehensively governs the parties' relationship and provides exclusive remedies, and that Plaintiffs have not adequately alleged SAC's inability to satisfy any contractual obligations.[39] Defendants suggest that the fraudulent transfer claim (Count VII) fails because Plaintiffs don't plead facts supporting insolvency or intent to hinder creditors at the time of the challenged distributions.[40] Finally, Defendants argue that the aiding-and-abetting and civil conspiracy claims (Counts VIII and IX) fail as a matter of law because corporate agents cannot aid and abet or conspire with their own entity absent well-pled

---

[36] *Id.*, 21–34.

[37] *Id.*, 34–40.

[38] *Id.*, 40–41.

[39] *Id.*, 41–43.

[40] *Id.*, 43–44.

allegations of conduct outside their corporate roles, and that claims against "John Doe" defendants are not permitted under Delaware law.[41]

## III. STANDARD OF REVIEW[42]

Under Rule 12(b)(6), "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[43] Under the well-settled Rule 12(b)(6) standard, the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[44]

---

[41]  Defs.' Op. Br., 44–48.

[42]  All Delaware courts treat decisions under Court of Chancery and Superior Court's respective Rules 12(b)(6) interchangeably. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (a Court of Chancery appeal quoting the Rule 12(b)(6) standard articulated in *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002), a Superior Court appeal); *see also CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *9 n.65 (Del. Ch. Jun. 29, 2020) (explaining that the there is no substantive difference between the two Courts' rules nor any operative difference in the analyses engaged under them to decide a Rule 12(b)(6) motion to dismiss) ("*CLP Toxicology I*").

[43]  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011); *Windsor I, LLC v. CW Capital Asset Mgmt. LLC*, 238 A.3d 863, 871−72 (Del. 2020) (quoting *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d at 168) ("The grant of a motion to dismiss is only appropriate when the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"). *See also CLP Toxicology I*, 2020 WL 3564622, at *3 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'").

[44]  *Cent. Mortg. Co.*, 27 A.3d at 535.

The Court does not, however, "accept as true conclusory allegations without any specific supporting factual allegations."[45]

## IV. ANALYSIS

The Court first considers Defendants' motion to dismiss Counts I and II and concludes that the Complaint adequately alleges breaches of the SPA's representations, warranties, and indemnification provisions. The Court then turns to Plaintiffs' remaining contract-based theories and finds them barred—either as untimely under the applicable statute of limitations or as duplicative of the core breach-of-contract claims. The Court next addresses Plaintiffs' fraud claims; they fail as they either impermissibly duplicate the contract claims or are not pleaded with the particularity Delaware law requires. But the Court finds that the fraudulent transfer claim is reasonably conceivable. The Court next addresses the claims asserted against the individuals sued and concludes that they cannot proceed as pleaded. Finally, the Court considers the unjust enrichment count and determines that consideration of such equitable relief is unwarranted where all agree that the parties' contract governs the contested issues.

In turn, for the now-explained reasons, the Defendants' motion to dismiss is **GRANTED, in part,** and **DENIED, in part**.

---

[45] *In re General Motors (Hughes) Shareholder Litigation*, 897 A.2d at 168 (internal quotes omitted).

## A. THE COMPLAINT SUFFICIENTLY STATES ITS CLAIMS FOR BREACH OF CONTRACT (COUNT I AND II).

SAC seeks dismissal of Counts I and II, which assert claims for breach of the representations and warranties (Count I) and breach of the indemnification provisions (Count II).[46] For each breach-of-contract claim, WIA "must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to [WIA]."[47] The Court's task is to assess the relevant contractual provisions and determine whether the Complaint pleads facts making it reasonably conceivable that SAC breached its representations or covenants.[48]

The allegations focus on three asserted nondisclosures: the 2019 AIG audit, the SLB Consent Injunction, and certain Undisclosed Additional Proceedings. Taken as true, these allegations support a claim that SAC failed to comply with Sections 3.10, 3.12, and 3.25 of the SPA. Accordingly, Rule 12(b)(6) dismissal of Counts I and II is not available to Defendants.

---

[46] Defs.' Op. Br. 21–32.

[47] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[48] *Cent. Mortg. Co.*, 27 A.3d at 536; *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 137 (Del. Ch. 2023); *VLIW Tech.*, 840 A.2d at 611 (quoting Ct. Ch. R. 8(a)(1)) ("In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains 'a short and plain statement of the claim showing that the pleader is entitled to relief.'").

**1. WIA pleads a reasonably conceivable claim regarding SAC's failure to disclose the AIG Audit.**

WIA alleges that SAC failed to disclose a 2019 AIG audit conducted while SAC still owned the company that gave notice that AIG believed fraud was occurring at SAIGA.[49] That audit expressly identified fraudulent activity occurring in transactions at SAIGA and warned that unless corrective measures were taken, AIG would revoke the subsidiary's ability to conduct business through its online portal.[50] Although SAC received this audit before signing and closing, the Complaint alleges that SAC didn't disclose it to WIA.[51] After the transaction closed, AIG followed through on its warning, revoked the subsidiary's portal access, and required an investigation before reinstating the office's ability to operate.[52] The parties disagree over whether SAC had an obligation under § 3.12(b) to provide WIA with the AIG letter,[53] even though Section 3.12 of the contract requires disclosure of notifications

---

[49] Second Amend. Compl., at ¶ 41.

[50] *Id.*, at ¶ 44.

[51] *Id.*, at ¶¶ 40–55.

[52] *Id.*

[53] *Compare* Def.'s Op. Br. 22–24 *with* Pl.'s Answering Br. 20–22. WIA contends these facts show breaches of two contractual representations. First, Section 3.12(b) represented that neither SAC nor its subsidiaries had received written notice within the past five years "of any actual, alleged or potential violation of, or failure to comply with, any *Law* that would, if true, have a Material Adverse Effect." Second Amend. Compl., at ¶¶ 19, 51; SPA § 3.12 (emphasis added). WIA argues that the 2019 AIG audit, which identified fraudulent activity and threatened operational revocation, constituted such a notice that was not provided to WIA. Second Amend. Compl., at ¶¶ 19, 51; SPA § 3.12. Second, Section 3.25 required SAC to provide "true, correct and complete copies of all material . . . documents that are responsive in all material respects to due diligence request lists delivered to the Company by the Buyer." Second Amend. Compl., at ¶ 58; SPA § 3.25. WIA's diligence requests encompassed carrier audits and compliance notices,

of the past five years of "potential violations of, or failure to comply with, any Law[.]"[54]

Under Delaware law, "[c]ontract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[55] Our courts emphasize that respecting the plain meaning of those terms is paramount.[56] And each refrains from distorting or twisting contract language.[57]

Applying those principles, "Law" is broadly defined in the contract, and AIG's notice to the company that fraudulent activity was occurring is—with little doubt—within the definition.[58] The SPA defines "Law" as follows:

> **"Law"** means any law, ordinance, principle of common law, code, constitution, rule, regulation, statute, act, treaty, court order, permit, approval or order of general applicability of any Governmental Authority, including rules and regulations promulgated thereunder.[59]

---

and the AIG audit was conceivably responsive. Second Amend. Compl., at ¶ 58; SPA § 3.25.

[54]  SPA § 3.12(b)(i).

[55]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[56]  *Stream TV Networks, Inc. v. See Cubic, Inc.*, 279 A.3d 323, 339 (Del. 2022); *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *3 (Del. Ch. Mar. 19, 2021); *In re Port of Wilmington Gantry Crane Litig.*, 238 A.3d 921, 929 (Del. Super. Ct. 2020).

[57]  *Lank v. Moyed*, 909 A.2d 106, 110 (Del. 2006); *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006); *Bobcat N. Am., LLC v. Inland Waste Holdings*, 2020 WL 4757042, at *4 (Del. Super. Ct. Aug. 17, 2020).

[58]  SPA § 1.01.

[59]  *Id.*

Certainly, the AIG audit gave SAC notice that SAIGA was not in compliance with "Law" as defined. Fraudulent conduct is, by its nature unlawful, and a written audit identifying fraudulent activity and threatening operational consequences unless remedial action is taken reasonably constitutes notice that—at very least—a violation of a "principle of common law" was occurring, let alone the myriad other violations that it might imply by nature of a highly regulated industry such as insurance. And nothing in Section 3.12 limits "notice" to communications issued by a governmental authority, nor does it require that a violation be conclusively established.[60] To the contrary, the inclusion of "actual, alleged or potential" violations reflect an intent to capture early warnings of noncompliance risk, including third-party audits that flag conduct exposing the company to legal action

---

[60] SPA § 3.12. The provision reads:

    (a) The Company and each Company Subsidiary are and have been in compliance in all material respects with every Law applicable to it or the conduct of their business.

    (b) ln the last five (5) years, neither the Company nor any Company Subsidiary has received any written notice:

        (i) of any actual, alleged or potential violation of, or failure to comply with, any Law that would, if true, have a Material Adverse Effect;

        (ii) of any administrative, civil or criminal investigation or audit by any Governmental Authority relating to the Company or any Company Subsidiary that did or reasonably could be expected to have a Material Adverse Effect; or

        (iii) from any Governmental Authority alleging that the Company or any Company Subsidiary is not in compliance with any applicable Law or Order that, if true, did or reasonably could be expected to have a Material Adverse Effect.

or regulatory sanction.[61]

The 2019 AIG audit did not merely identify operational issues; it flagged fraudulent activity and warned that the subsidiary's ability to conduct business would be revoked absent corrective action.[62] That warning placed SAC on notice that the subsidiary's conduct exposed the company to legal and operational consequences. At the pleading stage, WIA's allegation that SAC received such a warning and withheld it conceivably states a breach of the law-compliance representation.

The same lies for a breach of Section 3.25. That section is an affirmative representation that documents responsive "in all material respects" to Buyer's

---

[61] SPA § 3.12. The Court recognizes in § 3.12(b)(ii)–(iii) that "Governmental Authorities" are specified as distinct entities that may provide written notice of law violations warranting disclosure. But this specification does not imply the inverse—that only governmental entities can provide written notice of violations. Instead, the contract clearly requires disclosure of any written notice.

That reading of Section 3.12 is consistent with this Court's treatment of undisclosed audits that surface compliance risk before formal enforcement occurs. While not completely analogous, *In re Dura Medic Holdings, Inc. Consolidated Litigation* is helpful. 333 A.3d 227 (Del. Ch. 2025). There, the sellers closed a transaction without disclosing a series of Medicare audits that had identified significant compliance failures and placed the company on a path toward potential regulatory action. *Id.* at 251–57. Much like here, the audits were preliminary and no violation had yet been adjudicated. *Id.* The *In re Dura* audits mattered not because they were enforcement actions, but because they warned the company that it was operating in a legally precarious state— and that warning was precisely the type of information a buyer would expect to receive through the contract's representations. *Id.* The Court needn't now delve into the merits of the audit allegations. At a minimum, it is reasonably conceivable that SAC's failure could be deemed a violation of the SPA.

[62] *See generally* Def.'s Op. Br. Ex. F.

-17-

diligence requests were produced.[63]  Under 3.12, if WIA asked for all compliance notices from the past five years, the failure to produce the 2019 AIG audit is a reasonably conceivable breach.[64]  On this record, then, dismissal of the AIG-based breach of contract is **DENIED**.

### 2. WIA pleads a reasonably conceivable claim regarding SAC's failure to disclose the SLB Matter.

WIA alleges that SAC continued to violate a Consent Injunction entered in August 2019 without disclosing those violations.[65]  To be sure, SAC disclosed in the schedules that litigation was pending between SLB and certain SAC subsidiaries. That was the basis for the $250,000 escrow for contingent liabilities.[66]  But WIA says there's more.

According to the Complaint, SAC continued to violate the consent injunction to inflate the value of its subsidiaries while simultaneously generating liabilities far exceeding the agreed escrow.[67]  WIA contends that this conduct rendered false SAC's representation in Section 3.10 that neither SAC nor its subsidiaries was "subject to any Order" that would prohibit SAC from conducting business or be

---

[63]  SPA § 3.25.

[64]  SPA § 3.12.

[65]  Second Amend. Compl., at ¶¶ 63–64.

[66]  *Id.*

[67]  *Id.*, at ¶¶ 65–67.

reasonably expected to have a "Material Adverse Effect."[68]

Read naturally, Section 3.10 isn't confined to the disclosure of pending litigation.[69] It's a broader warranty that SAC is not subject to an Order that materially impairs its business.[70] SAC failed to disclose *ongoing* noncompliance with the consent injunction.[71] Even with this understanding, SAC responds that its limited disclosures suffice and that no further revelation was required.[72] Not so.

It is reasonably conceivable that undisclosed, ongoing violations of a consent injunction could materially impair the business and thereby render the Section 3.10 representation false. Disclosure of the SLB action doesn't cleanse the representation if SAC simultaneously omitted facts concerning its own *intentional* continuing violations of an operative injunction. Accepting the well-pleaded allegations as true,

---

[68] Second Amend. Compl., at ¶¶ 60–64; SPA § 3.10. The provision reads:

> Except as set forth in Schedule 3.10., there is no Proceeding pending or, to the Knowledge of the Company, threatened, against the Company or any Company Subsidiary or the transactions contemplated herein, including, without limitation, any Proceeding that challenges, or is reasonably likely to have the effect of preventing, delaying, making illegal, imposing limitations or conditions on, or otherwise interfering with the transactions contemplated in this Agreement or in any of the other Transaction Documents. Neither the Company nor any Company Subsidiary is subject to any Order (a) that prohibits the Company or any Company Subsidiary from conducting its business or (b) that would, individually or in the aggregate, have or would reasonably be expected to have, a Material Adverse Effect.

[69] SPA § 3.10.

[70] *Id.*

[71] Second Amend. Compl., at ¶ 66.

[72] *Compare id.*, at ¶¶ 68–74 *with* Defs.' Op. Br., 29–31.

-19-

WIA has stated a reasonably conceivable breach of Section 3.10.

### 3. WIA pleads a reasonably conceivable claim regarding SAC's failure to disclose "Additional Undisclosed Proceedings."

Finally, WIA argues that it is also due indemnification for "Additional Undisclosed Proceedings" breach-of-contract claims.[73] WIA contends that these matters, along with other entries, weren't disclosed in the SPA and thus violated Sections 3.10, 3.12, and 3.25 of the SPA.[74]

Defendants argue that these proceedings are inadequate because they are not referenced by name.[75] But Delaware law permits plaintiffs to rely on documents integral to their claim to satisfy the pleading burden.[76] The key document submitted shows specific amounts that Plaintiffs allege are owed through the indemnification process and identifies certain provisions of the SPA that were violated.[77] While the allegations are bare, they nonetheless clear the low bar imposed by Delaware's notice-pleading standard.[78] Read together with the Complaint, Plaintiffs summon

---

[73] *See generally* Second Amend. Compl., at ¶ 98 ("the Company failed to disclose other Proceedings of which it had actual knowledge prior to the effective date of the SPA. As of its last accounting, Plaintiffs were forced to incur costs and expenses in the sum of at least $258,899.48 relating to other Proceedings not disclosed by the Company, as detailed in the spreadsheet attached to the Indemnification Notice and Demand (the "Additional Undisclosed Proceedings"). The Company has failed and refused to honor its indemnification obligation with regard to reimbursement to the Plaintiffs of this sum."); Pls.' Answer, 37–38.

[74] Pls.' Answer, 37–38.

[75] Def.'s Op. Br., 32.

[76] *See* Ch. Ct. Civ. R. 10(a)(5); *see also* Super. Ct. Civ. R. 10(c).

[77] Second Amend. Compl. Ex. C (Part 2); *see generally* Second Amend. Compl.

[78] *VLIW Tech.*, 840 A.2d at 611 (quoting Ct. Ch. R. 8(a)) ("In alleging a breach of contract, a

enough support to survive a motion to dismiss.[79]

**B. WIA's Claims regarding SAC's Obligation to obtain Tail Insurance under Section 5.07 is Untimely.**

SPA Section 5.07 required SAC to obtain tail insurance following closing.[80] If such insurance could not be procured, the SPA permitted WIA to obtain the coverage itself and seek reimbursement from SAC.[81] WIA purchased the tail insurance and says that SAC did not reimburse the premium.[82]

SAC contends that any breach occurred no later than April 21, 2021, when WIA paid the premium, or, at the latest, thirty days after the Closing Date on May 9, 2021.[83] On that basis, SAC argues the claim is barred by Delaware's three-year statute of limitations for breach-of-contract actions.[84] WIA doesn't dispute that the alleged breach occurred more than three years before this action was filed.[85] Instead,

plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must only give the defendant fair notice of a claim and is to be liberally construed.").

[79] *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 140 (Del. Ch. 2004) (allowing the breach-of-contract claim to move to discovery, even though the claim was "vague"); *Eisenmann Corp. v. Gen. Motors Corp.*, 2000 WL 140781, at *18 (Del. Super. Ct. Jan. 28, 2000) (lack of detail in the complaint was not enough because breach had to be "fleshed out in the discovery process").

[80] Second Amend. Compl. Ex. A § 5.07.

[81] *Id.*

[82] Second Amend. Compl., at ¶ 112.

[83] Defs.' Op. Br., 33–34.

[84] *Id.*

[85] Pls.' Answer, 40–42.

WIA argues that the doctrine of laches should apply because "unusual conditions or extraordinary circumstances" are present.[86]

Under Delaware law, breach-of-contract claims are subject to a three-year statute of limitations,[87] and such claims accrue "at the time the contract is broken, not at the time when the actual damage results or is ascertained."[88] Where a claim is facially untimely, the plaintiff bears the burden of pleading facts that support "a reasonable inference that a tolling doctrine applies."[89]

The doctrine of laches is "rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[90] A deviation from the applicable statute of limitations and application of the doctrine of laches may be warranted where "unusual circumstances" are presented.[91] Our Supreme Court has explained that "[t]here is no precise definition of what constitutes unusual conditions or extraordinary circumstance" and identified factors "that could bear on the analysis"

---

[86] *Id.*

[87] DEL. CODE ANN. tit. 10, § 8106 (2025); *Lavender v. Koenig*, 2017 WL 443696 at *3 (Del. Super. Ct. Feb. 1, 2017).

[88] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *21 (Del. Super. Ct. Aug. 16, 2021) (quoting *Worrel v. Farmers Bank of State of Del.*, 430 A.2d 469, 472 (Del. 1981)).

[89] *Id*; *see also Yaw v. Talley*, 1994 WL 89019, at *6 (Del. Ch. Mar. 2, 1994); *Laugelle v. Bell Helicopter Textron, Inc.*, 2014 WL 2699880, at *3 (Del. Super. Ct. June 11, 2014).

[90] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (quoting *Adams v. Jankouskas,* 452 A.2d 148, 157 (Del. 1982)); *see also Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 & n.43 (Del. Ch. Feb. 25, 2014) (noting that the maxim is a special form of the general principle that "he who seeks equity must do equity").

[91] *IAC/Interactive Corp. v. O'Brien*, 26 A.3d 174, 175–76 (Del. 2011).

including:

> 1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; 2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; 3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; 4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and 5) whether, at the time this litigation was filed, there was a bona fide dispute as to the validity of the claim.[92]

WIA argues that the first and fifth of these are present here, and therefore the Court must permit its untimely claim to go forward.[93] WIA misses the mark on both.

As to the first factor, WIA alleges that it sent a notice of breach and demand for reimbursement on April 8, 2024, nearly three years after the latest possible accrual date.[94] SAC responded on April 22, 2024, declining to honor the demand.[95] Here, WIA's single demand letter does not reflect sustained or diligent efforts to enforce its rights.

WIA likewise fails to satisfy the fifth factor. A "bona fide dispute" means "that the claim would survive a motion to dismiss or, in other words, is not futile."[96]

---

[92] *Id.* at 178.

[93] Pls.' Answer, 40–43.

[94] *Id.* at 16, 41.

[95] *Id.* at 41.

[96] *Chertok v. Zillow, Inc.*, 2021 WL 4851816, at *10 (Del. Ch. Oct. 18, 2021), *aff'd*, 277 A.3d 1258 (Del. 2022) (quoting *Winklevoss Cap. Fund, LLC v. Shaw*, 2019 WL 994534, at *9 (Del. Ch. Mar. 1, 2019)).

"In application, this factor is most commonly fulfilled by a previous affirmative court finding that the untimely claims are valid."[97] No such finding exists here. The existence of a disagreement alone doesn't establish a bona fide dispute for laches purposes.

WIA doesn't meaningfully allege facts supporting the remaining factors, nor does it identify any extraordinary circumstance that would justify tolling the statute of limitations.[98] Accordingly, because the Section 5.07 claim accrued more than three years before this action was filed and no tolling doctrine applies, the claim is time-barred. SAC is due dismissal of the Section 5.07 tail insurance claim.

### C. THE BREACH OF DUTY TO DEFEND AND INDEMNIFY BUYER (COUNT V) AND DECLARATORY JUDGMENT FOR INDEMNIFICATION (COUNT III) CLAIMS ARE DUPLICATIVE OF COUNTS I AND II AND ARE THEREFORE DISMISSED.

The Court next addresses Counts V and III together. Although pleaded as separate causes of action, each depends entirely on the same alleged breaches of the SPA's indemnification provisions that are the subject of Counts I and II. Neither count raises a distinct factual dispute or legal issue requiring independent resolution. The Court therefore considers whether these claims serve any purpose apart from the breach-of-contract claims. They do not.

---

[97] *Winklevoss Cap. Fund*, 2019 WL 994534, at *9.

[98] Pls.' Answer, 41–43.

### 1. The Breach of Duty to Defend and Indemnify Buyer (Count V) Claim is duplicative of the Breach-of-Contract Claims.

"Whether to dismiss a claim as duplicative is within the discretion of the Court."[99]  "[T]here is no right to dismissal of such claims on the grounds they are duplicative, but doing so 'can help formulate and simplify the issues for trial.'"[100] This Court "may take steps to 'formulate and simplify . . . the issues' and to address 'such other matters as may aid in the disposition of the action.'"[101]  Delaware law permits pleading alternative and even inconsistent theories,[102] but a court, at times, may cut off truly doppelgänger claims—*i.e.* those based on the same operative facts, asserting the same legal rights, and seeking the same relief—at the pleading stage.[103]

Here, Counts I and II allege breaches of the SPA and seek indemnification for the same losses at issue in Count V.[104]  In each count, Plaintiffs request

---

[99]  *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *8 (Del. Ch. Aug. 25, 2020).

[100]  *Malt Fam. Tr. v. 777 Partners LLC*, 2023 WL 7476966, at *13 (Del. Ch. Nov. 13, 2023).

[101]  *Goldstein v. Denner*, 2022 WL 1797224, at *13 (Del. Ch. June 2, 2022) (quoting Ct. Ch. R. 16(a)) (cleaned up).

[102]  *Id.* ("[A] party may plead alternative and even inconsistent theories."); *see also* Ct. Ch. R. 8 ("A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . The party may also state as many separate claims or defenses as the party has regardless of consistency.").

[103]  *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *12 (Del. Ch. May 29, 2020) (explaining that dismissal of the duplicative claim there was warranted because (1) the claim sought the same relief, (2) relied on the same findings, and (3) related to the same legal rights under the contract as two other claims); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) (finding that, because a duplicative claim rested on the same contract provisions and the remedies were "equivalent" to the other claims, it could be dismissed); *Goldstein*, 2022 WL 1797224, at *13.

[104]  *Compare* Second Amend. Compl., at ¶¶ 205–08, 211–213 *with* Second Amend. Compl., at ¶

indemnification under the contract—expressly invoking the Article VII provision that is the sole grounding of Count V.[105]  And Count V doesn't identify any separate breach, duty, or injury.  Section 7.08 states simply:

> In the event that any of the Buyer Indemnitees sustains or suffers Losses for which a court of competent jurisdiction has finally determined the Company to be obligated under this Agreement to indemnify such Buyer Indemnitee, the Company acknowledges, understands and agrees that such Buyer Indemnitee shall be entitled to set-off the amount of such claim against any amount payable to the Company or to any member of the Company, including, without limitation, any amount of the Contingent Payment which is earned, by the Buyer or any Affiliate of the Buyer to the extent permitted by Law.[106]

The section provides a remedial mechanism contingent on the existence of indemnifiable losses—a mechanism already discussed in Plaintiff's prior claims. Whether Plaintiffs may set off against escrow funds necessarily turns on the same predicate questions and the same predicate facts raised in Counts I through III: whether Defendants breached the SPA and owe indemnification.  And the remedy is the same—indemnification through the SPA which includes section 7.08.

"Delaware courts . . . routinely dismiss duplicative claims, with duplicative allegations and duplicative requests for relief at the pleadings stage."[107]  Permitting

232.

[105] Second Amend. Compl., at ¶¶ 208, 213, 236.

[106] SPA § 7.08.

[107] *RSM US LLP v. Cision US Inc.*, 2025 WL 819123, at *2 n.20 (Del. Super. Ct. March 14, 2025) (noting *CoVenture – Burt Credit Opportunities GP, LLC v. Coleman*, 2023 WL 7179488 (Del.

Count V to proceed is of no utility. Because Count V is duplicative in both theory and relief, dismissal is appropriate.

### 2. The Declaratory Judgment (Count III) Claim is unnecessarily duplicative of the Breach-of-Contract Claims (Counts I and II).

Similar issues abide in Count III.[108] A declaratory judgment is a statutory remedy and "it is meant to provide relief in situations where a claim is ripe but would not support an action under common-law pleading rules.[109] That is, it is not intended to provide an alternative vehicle for relief that is already fully available through affirmative claims.[110] Indeed, "'[w]here a declaratory judgment claim is completely duplicative of the affirmative counts of the complaint, it must be dismissed,' and '[w]here a declaratory judgment does not set forth a distinct cause of action and the other claims fail, the declaratory judgment claim must fail.'"[111] Just so with Count III here.

---

Super. Ct. Nov. 1, 2023)).

[108] While Defendants do not expressly move to dismiss Count III for duplication, the Court may—in the proper instance—address that issue. *See Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460, at *15 (Del. Super. Ct. Sept. 29, 2021); *see generally Swipe Acquisition*, 2020 WL 5015863, at *8; *Goldstein*, 2022 WL 1797224, at *13 ("A court thus has discretion to address a duplicative claim in an effort to narrow the issues. At the pleading stage, however, a duplicative claim generally will go forward.") (internal citations omitted).

[109] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 (Del. Ch. Nov. 26, 2014).

[110] *Id.*; *PVP Aston, LLC v. U.S. Bank Nat'l Ass'n*, 2023 WL 525059, at *11 (Del. Super. Ct. Jan. 24, 2023), *aff'd*, 346 A.3d 1122 (Del. 2024).

[111] *PVP Aston*, 2023 WL 525059, at *11 (quoting *Sweetwater Point, LLC v. Kee*, 2020 WL 6561567, at *12 (Del. Super. Ct. Nov. 5, 2020)).

Count III realleges the same facts underlying Counts I and II and rests on the identical premise: that Defendants breached their indemnification obligations under the SPA by refusing to indemnify Plaintiffs for alleged Losses arising from purported breaches of representations, warranties, and covenants.[112] The declaration Plaintiffs seek—namely, that Defendants are obligated to indemnify them under Article VII of the SPA—is precisely the liability determination that would necessarily follow if Plaintiffs were to prevail on their breach-of-contract claims. The declaration simply demands the remedy of the breach-of-contract claims. But where the underlying premise of the declaratory claim is identical to that of the substantive claims, and where resolution of those claims would necessarily resolve the requested declaration, the declaratory judgment claim is duplicative.[113]

Accordingly, Count III fails to state an independent claim for relief and must be dismissed.

### D. THE FRAUD CLAIMS FAIL BECAUSE THEY IMPERMISSIBLY BOOTSTRAP CONTRACT CLAIMS OR AREN'T PLEADED WITH THE REQUIRED PARTICULARITY.

Under Delaware law, a claim for fraud must be pleaded with particularity; the plaintiff must allege:

> 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the

---

[112] *Compare* Second Amend. Compl., at ¶¶ 214–217 *with id.*, at ¶¶ 204–213.

[113] *See, e.g.*, *Blue Cube Spinco*, 2021 WL 4453460, at *16–17; *PVP Aston, LLC*, 2023 WL 525059, at *11.

representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[114]

Defendants' motion does not rely solely on whether the Complaint recites these elements.[115]

Delaware law requires plaintiffs to plead fraud claims with particularity.[116] "That requires a plaintiff to plead 'the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation.'"[117] But "even though fraud must be stated with particularity, this is still a motion to dismiss, and the . . . Plaintiffs are entitled to have [the Court] draw all reasonable inferences in their favor."[118]

---

[114] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004); Ch. Ct. Civ. R. 9(b).

[115] Ch. Ct. R. 9; *see generally ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908 (Del. Super. Ct. June 24, 2015).

[116] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1046 (Del. Ch. 2006); Ch. Ct. R. 9. *See also EZLinks Golf v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *3 (Del. Super. Ct. Mar. 13, 2017) (citing Del. Super. Ct. Civ. R. 9(b)); *Avve, Inc. v. Upstack Techs., Inc.*, 2019 WL 1643752, at *5 (Del. Super. Ct. Apr. 12, 2019) (observing that Rule 9(b) "deviates from the [short and plain statement ("notice pleading")] rule and imposes a heightened pleading standard for fraud"); *Cytotheryx, Inc. v. Castle Creek Biosciences, Inc.*, 2024 WL 4503220, at *6 (Del. Ch. Oct. 16, 2024); *Sam I Aggregator LP v. Mars HoldCo Corp.*, 2025 WL 2375279, at *5 (Del. Ch. Aug. 15, 2025); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144–45 (Del. Ch. 2003).

[117] *Sam I Aggregator LP*, 2025 WL 2375279, at *5 (quoting *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021)).

[118] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 805–06 (Del. Ch. 2009).

Beyond the heightened pleading standard, where the alleged misrepresentations arise from a negotiated acquisition agreement, the Court must also consider whether the fraud claims are substantively independent of the parties' contractual obligations or instead impermissibly bootstrap to alleged breaches of contract.[119]

The SPA contains provisions that both limit and preserve fraud claims. Sections 4.09 and 4.10 function as anti-reliance clauses, disclaiming reliance on extra-contractual representations and confining the universe of actionable statements to those expressly set forth in the SPA and its schedules.[120] Section 7.09 further narrows the scope of permissible fraud claims to "actual and intentional misrepresentation[s] of fact . . . set forth in [the SPA], with the express intention that the Buyer relies thereon to its detriment."[121]

---

[119] *ITW Glob. Invs.*, 2015 WL 3970908, at *6.

[120] SPA at § 4.09–.10.

[121] SPA at § 7.09. Delaware law enforces such provisions according to their terms. *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015) (citing *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012)) ("Delaware law enforces clauses that identify the specific information on which a party has relied and which foreclose reliance on other information."). Clauses that disclaim reliance on extra-contractual statements are routinely upheld and operate to bar fraud claims predicated on alleged misrepresentations outside the four corners of the agreement. *Prairie Cap.*, 132 A.3d at 50; *Abry Partners*, 891 A.2d at 1058; Steven M. Haas, *Contracting Around Fraud Under Delaware Law*, 10 DEL. L. REV. 49, 52–56 (2008). At the same time, Delaware law does not permit a seller to insulate itself from liability for knowingly false statements embedded within the contract itself. *Abry Partners*, 891 A.2d at 1035. Thus, taken together, these provisions foreclose claims based on off-contract statements while preserving a narrow category of fraud claims tied to intentional falsities in the express representations and warranties.

Applying that framework, the Court concludes that the fraud claims premised on the AIG Audit and the SLB allegations are impermissible bootstrapping to the asserted contractual disclosure claims. The fraud claim based on the alleged "Additional Undisclosed Proceedings," in turn, fails independently for lack of particularized allegations sufficient to satisfy Rule 9(b).

### 1. The AIG and SLB Fraud Claims are attempts at impermissible bootstrapping that must be dismissed.

Application of the anti-bootstrapping doctrine prevents parties from improperly converting breach-of-contract claims into fraud claims when both seek identical relief—that is, the allegations merely rehash breach-of-contract arguments without demonstrating separate wrongful conduct or distinct damages.[122] "As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."[123] This is because "his *remedy* should be in contract, not tort. Both claims lead to the same

---

[122] *ITW Glob. Invs*, 2015 WL 3970908, at *6; *see Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *26 (Del. Ch. Sept. 18, 2020) (discussing the differences of a contract claim and a tort claim); *Swipe Acquisition*, 2020 WL 5015863, at *11 ("Generally, the anti-bootstrapping rule applies when a plaintiff attempts to transmute a breach of contract claim into a fraud claim by adding conclusory allegations to its breach of contract allegations.").

[123] *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at *5 (D. Del. May 24, 2001); *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004); *Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*, 2005 WL 445710, at *3 (Del. Super. Ct. Feb. 23, 2005); *ITW Glob. Invs.*, 2015 WL 3970908, at *6.

destination—a remedy in damages causally related to the broken promises."[124]  But

as this Court has explained:

> [T]he anti-bootstrapping rule does not prevent parties from bringing a fraud claim if (1) the plaintiff alleges the seller knowingly made false contractual representations, (2) damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim, (3) the conduct occurs prior to the execution of the contract and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction, or (4) the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud claim.[125]

The exceptions do little to explain the rule.  Rather each simply describes circumstances in which the fraud claim has some discernable substantive independence from the contract claim.[126]  Where that independence is absent, the doctrine applies.[127]  The decisive inquiry, therefore, is whether the fraud claim rests on a duty imposed by law that is separate from the parties' contractual obligations, and whether it seeks damages that are qualitatively different from those available for breach of contract.[128]

---

[124] *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020) (emphasis added).

[125] *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022) (quoting *Pilot Air Freight*, 2020 WL 5588671, at *26) (cleaned up).

[126] *See generally ITW Glob. Invs.*, 2015 WL 3970908, at *6.

[127] *Id.* (quoting *Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*, 2005 WL 445710, at *3 (Del. Super. Ct. Feb. 23, 2005)) (explaining that the fraud claim must rest on "a violation of an independent duty imposed by law"); *see also Pinkert*, 2001 WL 641737, at *5; *Garber v. Whittaker*, 174 A. 34, 37 (Del. Super. Ct. 1934).

[128] *See ITW Glob. Invs.*, 2015 WL 3970908, at *6; *Garber*, 174 A. at 37 (quoting *Stock v. City of Bos.*, 21 N.E. 872, 872 (Mass. 1889)) ("A mere breach of contract cannot be sued on as a tort, but

Here, the AIG- and SLB-based fraud claims are not independent of the breach-of-contract claims. They arise from the same alleged misstatements, invoke the same contractual provisions, and seek the same redress for the same asserted harm.[129] The duty Plaintiffs allege was breached is entirely contractual.[130] The misrepresentations consist of statements made in the SPA's representations and warranties—particularly Sections 3.10, 3.12, and 3.25—and alleged failures to disclose information that Plaintiffs contend was required under the SPA's disclosure regime.[131] The Complaint repeatedly grounds the alleged fraud in express contractual promises and warranties, and in the indemnification framework the parties agreed would govern breaches of those promises.[132]

The remedies requested, too, are illuminative. The Complaint doesn't identify a single category of damages attributable to the fraud claims that is not also sought under the breach-of-contract and indemnification counts.[133] The alleged harm is the same in every respect.[134] That is a claim for contractual performance, not for an

---

for tortious acts, independent of the contract, a man may be sued in tort, though one of the consequences is a breach of his contract.").

[129] *See* Second Am. Compl., at ¶¶ 51–54, 58–59 (discussing AIG); 60–66, 73–83, 114–120 (discussing SLB); 144–149 (discussing indemnification demands tied to those disclosures). *Compare id.*, at ¶¶ 204–208, 209–213 *with id.* at ¶¶ 218–225.

[130] *Id.*, at ¶¶ 10, 14–16.

[131] *Id.*, at ¶¶ 218–225.

[132] *Id.*

[133] *Compare id.*, at ¶¶ 208, 213 *with id.*, at ¶ 236.

[134] *Compare id.*, at ¶¶ 208, 213 *with id.*, at ¶ 236.

independent tort injury. The fraud claims thus seek to enforce the SPA itself. They do not allege damages such as rescission, rescissory damages, or other relief that would unwind the transaction or compensate for a harm separate from the contractual bargain.[135] Instead, they seek the benefit of that bargain as Plaintiffs define it—through indemnification, escrow recovery, and reimbursement mechanisms expressly provided by the contract.[136]

The only remedy Plaintiffs identify as unique to their fraud claim is punitive damages.[137] But allowing punitive damages to serve as the sole distinction would permit Plaintiff to circumvent contractual remedies and limitations simply by relabeling a breach of contract.[138] A viable fraud claim requires qualitatively different damages—such as rescission or rescissory damages—reflecting a harm independent of the contractual expectancy. Absent such distinct damages, a fraud claim impermissibly bootstraps to the breach-of-contract claim and should be dismissed.[139]

---

[135] *See generally id.*

[136] *Id.*, at ¶ 236.

[137] *Id.*

[138] *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *6–9 (Del. Super. Ct. Apr. 7, 2020).

[139] *See e.g., Firmenich Inc.*, 2020 WL 1816191, at *6–9. In *Firmenich*, the court reaffirmed that a fraud claim cannot proceed alongside a breach-of-contract claim where the plaintiff fails to plead damages distinct from contract damages. Relying on *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, the court explained that failure to plead separate fraud damages is an independent ground for dismissal and that a request for punitive damages alone does not constitute a separate injury. *Id.* at *5. By contrast, the court acknowledged that certain of its decisions recognize that rescission or rescissory damages can distinguish fraud damages from contract damages where such relief is

**2. The "Additional Undisclosed Proceedings" aren't pleaded with the requisite particularity.**

The fraud allegations relating to purported "Additional Undisclosed Proceedings" do not satisfy Rule 9(b). These claims are based primarily on Exhibit C, which lists various line items under abbreviated headings, including a spreadsheet referencing "Legal (HR Matters)."[140] The Complaint does not allege with particularity what these matters are, how they constitute proceedings required to be disclosed under the SPA, or how their omission reflects an actual and intentional misrepresentation.[141]

To the extent Plaintiff now asserts that certain entries reflect employee misclassification or overtime violations, those theories do not appear in the Complaint and cannot be supplied through briefing.[142] Rule 9(b) requires that the plaintiff "must state with particularity the circumstances constituting fraud"[143] that includes the "time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."[144]

---

actually pleaded. *Id.* at *6–8. But neither are sought here in the Complaint. *See generally* Second Amend. Compl.

[140] *See* Pls.' Answer, 16; Second Amend. Compl. Ex. C (Part 2).

[141] *See generally* Second Amend. Compl.

[142] *Compare* Pls.' Answer, 16 *with* Second Amend. Compl.

[143] Ch. Ct. R. 9(b); *see also Cytotheryx*, 2024 WL 4503220, at *6; *Sam I Aggregator*, 2025 WL 2375279, at *5.

[144] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).

"Essentially, to satisfy that requirement, the plaintiff must allege circumstances sufficient to fairly apprise the defendant of the basis for the claim."[145]  Attaching a spreadsheet with unexplained entries, without factual context or allegations of any element of fraud, is insufficient.  Accordingly, the fraud claim premised on the alleged Additional Undisclosed Proceedings is inadequately pleaded and dismissed.

**E.  COUNT VII STATES A PERMISSIBLE CLAIM FOR FRAUDULENT TRANSFER.**

The Court next moves to Count VII.  That alleges fraudulent transfer under 6 *Del. C.* §§ 1304 and 1305.[146]  Section 1304 imposes liability where a debtor transfers assets "(1) [w]ith actual intent to hinder, delay or defraud any creditor of the debtor; or (2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor[.]"[147]  Each of these inquiries turns on context and surrounding circumstances of the transfer.[148]

The Complaint alleges that SAC, after receiving SPA proceeds and escrow releases, caused funds to be distributed to its members in a manner that left the

---

[145] *Id.*; *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017); *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *9 (Del. Ch. Aug. 12, 2021); *see also Patel v. Sunvest Realty Corp.*, 2018 WL 4961392, at *3 (Del. Super. Ct. Oct. 15, 2018) (applying the same standard as the Court of Chancery).

[146] Defs.' Op. Br., 43–44; Second Amend. Compl., at ¶¶ 258–68.

[147] DEL. CODE ANN. tit. 6, § 1304(a)(1)–(2) (2025).

[148] DEL. CODE ANN. tit. 6, § 1304(b) (2025) (considering factors such as "The transfer or obligation was to an insider;" "The transfer or obligation was disclosed or concealed;" "The transfer was of substantially all the debtor's assets;" and "The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred").

Company without sufficient assets to satisfy anticipated indemnification obligations.[149] It further alleges that these distributions were directed by SAC's principals with knowledge of those obligations and without any corresponding value flowing back to the Company.[150] Those allegations speak directly to statutory indicators of fraudulent transfer, including insider transfers, lack of equivalent value, and insolvency following the transfers.[151]

The allegations brought in the Complaint are similar to those in *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*.[152] In both cases, the seller received transaction proceeds and then caused those proceeds to be distributed to insiders in a manner that allegedly left the company without sufficient assets to satisfy known or anticipated post-closing obligations.[153] In *CLP Toxicology*, just as here, the complaint alleged that the distributions were made with knowledge of those obligations, without any corresponding value flowing back to the company, and that the transfers effectively decapitalized the entity.[154]

Whether WIA's allegations are ultimately borne out is a question of proof, not pleading. SAC's effort to defeat the claim rests largely on factual counterweights—

---

[149] Second Am. Compl, at ¶¶ 264–67; *see also* Pls.' Answer, 52–54.

[150] Second Am. Compl, at ¶¶ 264–67; *see also* Pls.' Answer, 52–54.

[151] *See* DEL. CODE ANN. tit. 6, § 1304(b) (2025).

[152] *CLP Toxicology I*, 2020 WL 3564622.

[153] *Id.* at *7, 21

[154] *Id.*

most notably, the existence of escrowed funds and insurance coverage—that require assumptions about asset availability, restrictions on use, and the scope of coverage.[155] SAC asks the Court to credit its version of disputed financial and transactional facts and to reject allegations that, if proven, conceivably establish the elements of a fraudulent transfer under Delaware law.[156] But the Court cannot do that on 12(b)(6) motion to dismiss.[157] The sufficiency of SAC's remaining assets, the effect of the distributions on its ability to meet obligations, and the intent motivating those transfers are matters that depend on discovery and, if necessary, factfinding.

## F. DELAWARE DOESN'T ALLOW CLAIMS AGAINST "JOHN DOES."

"[I]t is well-settled Delaware law that fictitious name practice is not permitted."[158] And because "there is no statute or rule specifically authorizing [such]" and thus, "[f]iling a claim against 'John Doe' has no legal effect in this State."[159] Defendants correctly argue that claims asserted here against unnamed

---

[155] *See* Defs.' Reply, 25–26.

[156] Defs.' Reply, 25–26.

[157] *Cent. Mortg. Co.*, 27 A.3d at 536 ("Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss.").

[158] *Haskins v. Kay*, 2007 WL 4662114, at *5 (Del. Super. Ct. Sept. 27, 2007) (citing *Hutchinson v. Fish Engineering Corp.*, 153 A.2d 594, 595 (Del. Ch. 1959), *app. dismissed*, 162 A.2d 722 (Del. 1960); *Dayton v. Collison*, 2018 WL 565304, at *2 (Del. Super. Jan. 24, 2018); *Crawford v. Syngenta Crop Protection, LLC*, 2024 WL 2831554, at *13 (Del. Super. Ct. May 31, 2024).

[159] *Haskins*, 2007 WL 4662114, at *5; *Dayton*, 2018 WL 565304, at *2; *Crawford*, 2024 WL 2831554, at *13.

defendants are not cognizable and must be dismissed.[160]  Delaware's prohibition on fictitious name practice reflects a settled rule, not a discretionary procedural preference.[161]

WIA nonetheless asserts that the Court's prior Order permitting the temporary use of "John Doe" designations overrides this established precedent.[162]  It doesn't.

A court's preliminary or case-management order allowing placeholder designations cannot abrogate binding Delaware law or confer legal effect on claims that the law expressly forbids.  To hold otherwise would permit routine procedural orders to supersede substantive legal constraints.  Accordingly, because Delaware law unambiguously bars fictitious name practice and affords no legal effect to claims asserted against unnamed defendants, the "John Does" are dismissed as defendants.

### G. Mr. Thomson Wasn't a "Separate Person" From SAC—WIA Has Failed to State Claims for Aiding and Abetting (Count VIII) and Civil Conspiracy (Count IX) Against Mr. Thomson.

SAC seeks dismissal of WIA's aiding and abetting and civil conspiracy claims against Mr. Thomson.[163]  SAC argues that because Mr. Thomson signed the SPA in his capacity as manager of SAC, only one party—SAC itself—was involved in the

---

[160]  Defs.' Op. Br., 46.

[161]  *Crawford*, 2024 WL 2831554, at *13.

[162]  Pls.' Answer, 57.

[163]  Defs.' Op. Br., 44–46.

alleged scheme, making aiding and abetting legally impossible.[164] WIA, however, responds that the general rule is inapplicable because Mr. Thomson acted out of personal motives rather than solely as SAC's agent.[165]

To state a claim for aiding and abetting, a plaintiff must allege: (i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance.[166] Ordinarily, the "intra-corporate conspiracy doctrine" bars such claims,[167] as

> [i]t is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. Accordingly, it is entirely sensible that, as a general rule, agents of a corporation cannot conspire with one another or aid and abet each other's torts. The only instance where this general rule will not apply is when a corporate officer steps out of her corporate role and acts pursuant to personal motives.[168]

Here, WIA fails to plead facts sufficient to bring Mr. Thomson's conduct within the narrow personal motivation exception to the intra-corporate conspiracy doctrine.[169] Although the Complaint characterizes Mr. Thomson's conduct as

---

[164] Defs.' Op. Br., 45 (relying on *RGIS Int'l Transition Holdco, LLC v. Retail Servs. Wis Corp.*, 2024 WL 568515, at *6 (Del. Super. Ct. Feb 13, 2024); *Anshutz Corp.*, 2020 WL 3096744, at *17.

[165] Pls.' Answer, 55; Second Amend. Compl., at ¶¶ 269–280.

[166] *RGIS Int'l Transition Holdco*, 2024 WL 568515, at *5 (quoting *Great Hill Equity Pr's*, 2014 WL 6703980, at *23).

[167] *See Urvan v. AMMO, Inc.*, 2024 WL 863688, at *17 (Del. Ch. Feb. 27, 2024); *Anshutz Corp.*, 2020 WL 3096744, at *17.

[168] *Anshutz Corp.*, 2020 WL 3096744, at *17.

[169] Second Amend. Compl., at ¶ 131; *RGIS Int'l Transition Holdco*, 2024 WL 568515, at *5–6 ; *see generally Anschutz Corp.*, 2020 WL 3096744, at *17.

fraudulent, the well-pleaded allegations establish that all relevant actions were undertaken in his capacity as SAC's manager, not as an individual pursuing interests independent of the Company.[170]

WIA alleges that Mr. Thomson participated in negotiations of the SPA, executed the agreement on behalf of the Seller Parties, and later authorized the distribution of sale proceeds.[171] These acts are quintessentially managerial. Each alleged act occurred squarely within the scope of Mr. Thomson's authority in furtherance of SAC's business objectives—namely, consummating the sale transaction and distributing proceeds to its members.

And critically, the only personal motivation alleged by WIA is Mr. Thomson's receipt of monetary benefits resulting from the transaction and subsequent distributions. Such allegations are insufficient as a matter of law.[172] Financial gain that flows from one's status as an officer and equity holder—including compensation or sale proceeds—does not alone constitute a personal motive independent of the corporation.[173] Were it otherwise, the exception would likely

---

[170] *See generally* Second Amend. Compl.

[171] Second Amend. Compl., at ¶ 131.

[172] *See generally Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *8 (Del. Ch. Mar. 3, 2005); *RGIS Int'l Transition Holdco*, 2024 WL 568515, at *5-6; *Driven Intermediate Holdings, Inc. v. Jimenez*, 2025 WL 2631622, at *5-6 (Del. Super. Ct. Aug. 28, 2025).

[173] For example, in *Driven Intermediate Holdings*, the Superior Court found the personal-motivation exception inapplicable even where the director obtained the highest total cash proceeds in a sale of a company. 2025 WL 2631622, at *5. There, the Court stated that "proceeds from the sale of the Target Company are not independent of the Defendants' employment. Indeed, if the

swallow the rule—most every corporate transaction confers some "personal" benefit on those who own or manage the company.

Because WIA has not conceivably alleged that Mr. Thomson acted outside his corporate role or pursuant to interests independent of SAC, the intra-corporate conspiracy doctrine applies. Resultingly, WIA cannot establish the requisite multiplicity of actors necessary to support claims for aiding and abetting or civil conspiracy. Thus, WIA has failed to state claims for aiding and abetting (Count VIII) and civil conspiracy (Count IX) against Mr. Thomson; they must be dismissed.

## H. THE REMEDIES ARE GOVERNED BY CONTRACT, SO DISMISSAL OF THE UNJUST ENRICHMENT (COUNT VI) CLAIM IS APPROPRIATE.

WIA alleges that SAC received funds released from the escrow accounts and wrongfully distributed those proceeds to its members—including Mr. Thomas.[174] WIA asserts that by doing so, SAC rendered itself unable to satisfy its indemnification obligations under the SPA, in violation of 6 *Del. C.* § 18-607, and Mr. Thomas received an unjust benefit.[175]

"In order to recover on a claim of unjust enrichment, a plaintiff must prove: (1) an enrichment; (2) an impoverishment; (3) a relationship between the enrichment

---

Defendants were not officers of the Target Company at the time of the sale, they would not have received such proceeds." *Id.* (citing *RGIS Int'l Transition Holdco*, 2024 WL 568515, at *6).

[174] Second Amend. Compl., at ¶¶ 237–57; DEL. CODE ANN. tit. 6, § 18–607 (2025) (discussing limitations on distribution of an LLC).

[175] Second Amend. Compl., at ¶¶ 237–57; DEL. CODE ANN. tit. 6, § 18–607 (2025).

and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law."[176]  An unjust enrichment claim pled in the context of a contract may survive a motion to dismiss where the "factual basis for the unjust enrichment claim [is] independent of the allegations supporting the breach of contract claim."[177] At the pleading stage, the plaintiff need not prove its entitlement to recovery; instead, the plaintiff must show only that it is reasonably conceivable that it could recover under an unjust enrichment theory.[178]

It is fundamental in Delaware law that "[w]here 'a contract already comprehensively governs the relevant relationship between the parties,' the contract 'alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied.'"[179]  Nowhere in the Complaint do Plaintiffs allege that the SPA is invalid, unenforceable, or uncertain.[180]  To the contrary, Plaintiffs' unjust enrichment claim is expressly premised on SAC's alleged failure to satisfy its indemnification obligations under the SPA.[181]  The alleged claim directly arises from

[176] *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2021 WL 2588905, at *14 (Del. Ch. June 14, 2021) ("*CLP Toxicology II*"); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[177] *Capano v. Ecofibre Ltd.*, 2025 WL 419494, at *1 (Del. Ch. Feb. 5, 2025); *see CLP Toxicology II*, 2021 WL 2588905, at *15.

[178] *CLP Toxicology II*, 2021 WL 2588905, at *15.

[179] *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *14 (Del. Ch. Apr. 30, 2018) (cleaned up).

[180] *See generally* Second Amend. Compl.

[181] *Compare id.*, at ¶¶ 281–287 *with id.*, at ¶¶ 204–13.

the parties' contractual relationship and from the rights and obligations the SPA establishes.[182] In short, the SPA governs the parties' contractual rights and remedies. WIA has therefore stated an impermissible claim for unjust enrichment.

## VI. CONCLUSION

First and foremost, for the reasons explained, the charging of Paul Thomson with Aiding and Abetting (Count VIII) and Civil Conspiracy (Count IX) and the naming of "John Does" fail, so they are dismissed as defendants from this action.

Counts I and II of the Complaint adequately allege breaches of the SPA's representations, warranties, and indemnification provisions. Plaintiffs request for a declaratory judgment that SAC is obligated under the SPA to indemnify them for covered losses (Count III) and separate claim of a breach of a duty to defend and indemnify (Count V), however, are unnecessarily duplicative of those first two counts.

Count IV—in which Plaintiffs allege fraud, insisting that Defendants knowingly misrepresented or concealed material facts in the SPA with the intent that Plaintiffs rely on those representations when entering the transaction and authorizing the release of escrow funds—either impermissibly duplicates the contract claims or just isn't pleaded with the particularity Delaware law requires. But the fraudulent transfer claim (Count VII) contending that Defendants distributed substantially all

---

[182] *Id.* at ¶¶ 281–287.

of the Company's assets to insiders while insolvent or with actual intent to hinder, delay, or defraud Plaintiffs as creditors is reasonably conceivable.

Count VI alleging unjust enrichment has no footing as no one suggests that the parties' contract does not govern each issue raised.

For these reasons, Defendants' motion to dismiss is **DENIED** as to Counts I, II, and VII.  It is **GRANTED** as to Counts III, IV, V, VI, VIII, IX, and any allegation asserting liability of a "John Doe."

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge*

_____

\* Sitting by designation of the Chief Justice pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. May 30, 2025) (FIFTH AMENDED ORDER).